990 F.2d 1271
 301 U.S.App.D.C. 1, 61 USLW 2591, 9
IER Cases 1569
 NATIONAL TREASURY EMPLOYEES UNION, et al., Appellants,
v.
UNITED STATES of America, et al.,
NATIONAL TREASURY EMPLOYEES UNION, et al., Appellants,
v.
UNITED STATES of America, et al.,
Peter G. CRANE, et al., Appellants,
v.
UNITED STATES of America, et al.,
NATIONAL TREASURY EMPLOYEES UNION, et al.,
v.
UNITED STATES of America, et al., Appellants.
AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al.,
v.
UNITED STATES of America, et al., Appellants.
Peter G. CRANE, et al.,
v.
UNITED STATES of America, et al., Appellants.
 Nos. 92-5085, 92-5139, 92-5170, 92-5235, 92-5236 and 92-5237.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 6, 1992.
Decided March 30, 1993.
As Amended April 8, 1993.
Rehearing Denied in No. 92-5085 Sept. 21, 1993.
 
 [301 U.S.App.D.C. 2] Alfred Mollin, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and John C. Hoyle, were on the brief, for appellants. Michael Jay Singer entered an appearance for appellants.
 Gregory O'Duden, with whom Elaine Kaplan, Barbara A. Atkin, Mark Roth, and Anne Wagner were on the brief, for appellees. John Vanderstar and Arthur Spitzer were on the reply brief for appellees. David F. Klein, Steven R. Shapiro, and Elizabeth Symonds entered an appearance for appellees.
 Roger M. Witten, Carol F. Lee, Kenneth P. Stern, and Rebecca Arbogast were on the brief for amicus curiae Common Cause. Leslie A. Harris entered an appearance for amicus curiae Common Cause.
 Before: WILLIAMS, SENTELLE and RANDOLPH, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 Concurring opinion filed by Circuit Judge RANDOLPH.
 Dissenting opinion filed by Circuit Judge SENTELLE.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 In § 501(b) of the Ethics in Government Act, 5 U.S.C. app. § 501 et seq., Congress provided that "[a]n individual may not receive any honorarium while that individual is a Member [of Congress, or] officer or employee [of the federal government]." Congress defined "honorarium" as "a payment of money or anything of value for an appearance, speech or article (including a series of appearances, speeches, or articles if the subject matter is directly related to the individual's official duties or the payment is made because of the individual's status with the Government) ... excluding any actual and necessary travel expenses." Id. § 505(3). The Office of Government Ethics has promulgated regulations implementing the Act for officers and employees of the executive branch. See 56 Fed.Reg. 1721 (January 17, 1991) (to be codified at 5 CFR § 2636.101ff.); 57 Fed.Reg. 601 (January 8, 1992) (amending 5 C.F.R. § 2636.203).
 
 
 2
 Employees of the executive branch, and several unions of such employees, responded to enactment of the honorarium ban by challenging it in district court as a violation of their rights under the First Amendment. The National Treasury Employees Union was certified as the class representative for all affected executive branch employees below the grade of GS-16,[1] and the various cases were consolidated.
 
 
 3
 On cross motions for summary judgment, the district court found the ban a violation of the First Amendment in so far as it affected the speech of executive branch employees.[2] It enjoined enforcement, but stayed its judgment pending appeal. 788 F.Supp. 4. The government appeals from the judgment and injunction, and plaintiffs appeal from the stay. We affirm the judgment of the district court on the merits; this moots the problem of the stay.
 
 
 4
 * * *
 
 
 5
 Because the case involves a government burden on the speech of its own employees, Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), supplies the standard for judicial review of the congressional action. In Pickering a county had dismissed a teacher for publishing in a newspaper a letter criticizing the county school board's allocation of funds. [301 U.S.App.D.C. 3] While saying that the state could not make public employment conditional upon relinquishment of "the First Amendment rights [employees] would otherwise enjoy as citizens to comment on matters of public interest", id. at 568, 88 S.Ct. at 1734, the Court also said that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Id. It identified the "problem" as being "to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id.
 
 
 6
 As Pickering defines the employees' speech interests in terms of "matter[s] of public concern", see also Connick v. Myers, 461 U.S. 138, 146-47, 103 S.Ct. 1684, 1689-90, 75 L.Ed.2d 708 (1983), we pause briefly to consider whether this case involves such matters. In Connick the Court spoke broadly of expression "relating to any matter of political, social, or other concern to the community." Viewing the idea of "public concern" in the abstract, one might suppose it excluded some of the topics on which plaintiffs have spoken or written--such as the technology of Civil War ironclads. See Joint Appendix ("J.A.") at 119.
 
 
 7
 But Connick makes clear that the "public concern" criterion does not require any great intensity or breadth of public interest in the subject. It is thus far broader than the sort of "public questions" in which a person must be involved for application of New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). See, e.g., Gertz v. Robert Welch, Inc., 418 U.S. 323, 351, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974); Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1296 (D.C.Cir.1980). In Connick the employee had circulated a questionnaire asking fellow employees for their views on such matters as the level of office morale, their confidence in various supervisors and the need for a grievance committee. These the Court wrote off as "mere extensions of Myers' dispute over her transfer". 461 U.S. at 148, 103 S.Ct. at 1690. In contrast, it found a question on whether employees ever felt "pressured to work in political campaigns on behalf of office supported candidates" to be of interest to the community. Id. at 149, 103 S.Ct. at 1691. The contrast, then, was between issues of external interest as opposed to ones of internal office management. See also id. at 146, 103 S.Ct. at 1689 (invoking need for officials to "enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary"). Accordingly, we read the "public concern" criterion as referring not to the number of interested listeners or readers but to whether the expression relates to some issue of interest beyond the employee's bureaucratic niche. None of the samples of past or intended expression mentioned by plaintiffs involves such a parochial concern.
 
 
 8
 Although § 501(b) prohibits no speech, it places a financial burden on speech--denial of compensation. While the employees' First Amendment interest is therefore somewhat less weighty than under a flat ban, there can be no doubt that the burden counts for purposes of the Pickering balance. In Simon & Schuster, Inc. v. New York State Crime Victims Board, --- U.S. ----, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991), the Supreme Court considered a statute that singled out compensation for writings by a person convicted or accused of a crime on the subject of his crime. Though at times seeming to characterize the statute as content-based, see, e.g., id. at ----, 112 S.Ct. at 508, the Court ultimately declined to say whether it was or not, and invalidated it as not "narrowly tailored" enough even under "the more lenient tailoring standards applied" to content-neutral provisions, id. at ---- - ---- n. **, 112 S.Ct. at 511-12 n.**. The point that the burden was simply denial of compensation played no apparent role in the Court's "tailoring" analysis. Similarly, the financial character of the limitation here affects only the "weight" of the employees' interest in the Pickering balance.
 
 
 9
 [301 U.S.App.D.C. 4] Neither party disputes that the government has a strong interest in protecting the integrity and efficiency of public service and in avoiding even the appearance of impropriety created by abuse of the practice of receiving honoraria. Indeed, in Keeffe v. Library of Congress, 777 F.2d 1573, 1581 (D.C.Cir.1985), we identified "prevent[ing] erosion of congressional and public confidence in the integrity of the [Congressional Research] Service" as a compelling justification for limits on its analysts' participation in political activities. We can safely assume for the purposes of this opinion that the interest in avoiding the appearance of impropriety is strong enough to outweigh government employees' interest in engaging in speech for compensation where the compensation creates such an appearance, and so is strong enough to justify a ban on compensation in those circumstances. Thus, for some of § 501(b)'s applications--perhaps many of them--the Pickering balance supports its constitutionality.
 
 
 10
 That conclusion will not save § 501(b), however, if it either is "overbroad" or manifests a want of "narrow tailoring." Plaintiffs in their attack on the statute use the terms more or less interchangeably. So has the Supreme Court, on occasion, when speaking of the substance of the doctrines, i.e., what they demand of a statute in terms of focus on a genuine evil. Thus in Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), the Court started its analysis of the subject by posing the question whether the statute was "sufficiently narrowly tailored to achieve its goal", id. at 660, 110 S.Ct. at 1397, and ended by finding that it was "not substantially overbroad", id. at 661, 110 S.Ct. at 1398. See also Secretary of State of Maryland v. J.H. Munson Co., 467 U.S. 947, 965-66 n. 13, 104 S.Ct. 2839, 2851-52 n. 13, 81 L.Ed.2d 786 (1984) (" 'Overbreadth' has also been used to describe a challenge to a statute that ... does not employ means narrowly tailored to serve a compelling governmental interest"); cf. Simon & Schuster, Inc. v. New York State Crime Victims Board, --- U.S. at ----, 112 S.Ct. at 511-12 (addressing whether law "is significantly overinclusive" and concluding that it "is ... not narrowly tailored to achieve the State's objective"). Moreover, the terms used by the Court to describe the doctrines' substance do not seem to suggest a material difference. As to overbreadth, the Court said in Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), "[P]articularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real [i.e., not based on speculative constructions of the statute] but substantial as well, judged in relation to the statute's plainly legitimate sweep." Id. at 615, 93 S.Ct. at 2917. And in its most explicit treatment of narrow tailoring, Ward v. Rock Against Racism, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), it said:
 
 
 11
 [T]he requirement of narrow tailoring is satisfied "so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." ... To be sure, this standard does not mean that a ... regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.
 
 
 12
 Id. at 799, 109 S.Ct. at 2758 (citations and footnote omitted). Although Ward involved a time, place, and manner restriction, the Court has since indicated that this concept of "tailoring" applies to any content-neutral restriction on speech. See Simon & Schuster, --- U.S. at ---- n. **, 112 S.Ct. at 511 n.**. Thus both doctrines invalidate a statute that imposes "substantial" burdens that are not supported by the statute's justifications; i.e., both invalidate statutes that are unduly "overinclusive."
 
 
 13
 Conceivably the quality of fit demanded by the two doctrines differs. The Court has stressed that overbreadth is "strong medicine", Broadrick, 413 U.S. at 613, 93 S.Ct. at 2916, possibly suggesting that a plaintiff can prevail under that doctrine only by showing more drastic overinclusiveness [301 U.S.App.D.C. 5] than would be necessary to prevail on a narrow tailoring claim. Such a view might make some sense, as overbreadth (in its classic form) gives the plaintiff a procedural advantage--the ability to challenge a statute on the basis of its effect on others--see, e.g., Thornhill v. Alabama, 310 U.S. 88, 97-98, 60 S.Ct. 736, 741-742, 84 L.Ed. 1093 (1940); City Council v. Taxpayers for Vincent, 466 U.S. 789, 796-98, 104 S.Ct. 2118, 2124-25, 80 L.Ed.2d 772 (1984); Board of Trustees v. Fox, 492 U.S. 469, 482-83, 109 S.Ct. 3028, 3035-36, 106 L.Ed.2d 388 (1989)--in exchange for which he might be expected to surmount an exceptional substantive hurdle. But, as developed below, we cannot see that § 501(b) satisfies even the most lenient form of the requirement.
 
 
 14
 Although the Supreme Court has occasionally suggested that courts may proceed to consider a facial overbreadth challenge only after having determined that it is valid as applied to the challengers, see, e.g., Fox, 492 U.S. at 484-85, 109 S.Ct. at 3037, in fact the Court allows facial overinclusiveness claims by parties whose conduct may well be constitutionally protected--such as many of the plaintiffs here. In Austin v. Michigan Chamber of Commerce, for example, the Chamber of Commerce mounted a pre-enforcement facial challenge to a state restriction on corporate political expenditures, maintaining that its speech was in fact protected. 494 U.S. at 661-65. Yet the Court addressed the facial attack on the statute's scope.[3] See also New York State Club Ass'n v. New York City, 487 U.S. 1, 13-15, 108 S.Ct. 2225, 2234-35, 101 L.Ed.2d 1 (1988) (applying standard overbreadth analysis without even considering whether members of the Association could be legitimately subject to the ordinance); Boos v. Barry, 485 U.S. 312, 329-32, 108 S.Ct. 1157, 1168-69, 99 L.Ed.2d 333 (1988) (applying overbreadth analysis without either a concession by plaintiffs that their speech could be constitutionally restricted or a finding to that effect, and indeed in the face of indications that they claimed their speech was protected, see id. at 315-16, 108 S.Ct. at 1160-61), affirming in relevant part Finzer v. Barry, 798 F.2d 1450, 1472 (D.C.Cir.1986) (addressing facial attack on the statute's scope in the face of the challengers' assertion that their speech was protected); but cf. Sanjour v. EPA, 984 F.2d 434, 444 & n. 10 (D.C.Cir.1993).
 
 
 15
 Accordingly we reach the merits of the plaintiffs' overinclusiveness claims. To create the sort of impropriety or appearance of impropriety at which the statute is evidently aimed, there would have to be some sort of nexus between the employee's job and either the subject matter of the expression or the character of the payor. But as to many of the plaintiffs, the government identifies no such nexus. These plaintiffs include a Nuclear Regulatory Commission lawyer who writes on Russian history of the late Romanov era, see J.A. at 51; a Postal Service mailhandler who writes and gives speeches on the Quaker religion, id. at 63; a Department of Labor lawyer who lectures on Judaism, id. at 70; a Department of Health and Human Services employee who reviews art, musical, and theater performances for local newspapers, id. at 95; and a civilian Navy electronics technician who writes on Civil War ironclad vessel technology, id. at 119. The topics appear not to be such that the employee could have used information acquired in the course of his government work; there is no suggestion of any use of government time, word processors, paper or ink; there is no suggestion that the institutions that have paid or are likely to pay for the speeches or writings would have some relationship with the employee's agency that would make them wish to curry its favor.
 
 
 16
 Of course the ban also covers payments for speeches and articles that may well create an appearance of impropriety. In fact, even some of the plaintiffs receive payments that might at least raise an eyebrow. For example, a business editor at [301 U.S.App.D.C. 6] the Voice of America also receives payment for business analysis that he provides various media. J.A. 57-62. From his own account it seems at least quite possible that he uses information acquired on the job; and it is possible that the media to whom he sells might believe that his favor could improve the chances that VOA would use some of their materials. (The editor suggests that banning compensation for his writings and talks will make government service far less attractive to hard-working, intelligent, creative persons. Surely this is so. We do not here address whether such values might count in the Pickering balance.) Another plaintiff is a GS-7 "tax examining assistant". See J.A. 85-86. In view of the universality of citizens' subjection to the Internal Revenue Service, we can understand some anxiety about receipt of payment by such an employee. However, even assuming arguendo that § 501(b) could be lawfully applied to these last two plaintiffs, it is clear that the ban reaches a lot of compensation that has no nexus to government work that could give rise to the slightest concern.[4]
 
 
 17
 There remains the possibility that these apparent excesses might be legitimized by the enforcement difficulties--including the problem of government scrutiny of subject matter--that any narrower restriction would involve. (Ironically, one plaintiff objects to even the screening that is involved in enforcement of § 501(b). J.A. 64.) If manageable lines are available to limit the ban to genuinely troubling compensation, then excesses, even if they affected few speakers, would appear gratuitous.
 
 
 18
 In fact, however, the government points neither to improprieties in the pre-s 501(b) era that would have been prevented by § 501(b) but not by the prior regulations, nor to any serious enforcement or line-drawing costs associated with those regulations. Cf. Boos v. Barry, 485 U.S. at 324-29, 108 S.Ct. 1165-68 (stating that the "most useful starting point" for assessing whether a statute is narrowly tailored is to "compare it with an analogous statute"). As summarized in testimony before the Senate Committee on Governmental Affairs, the prior regulations allowed honoraria so long as the speaker or writer held a rank lower than GS-16 and all of the following questions could be answered negatively:
 
 
 19
 (1) Is the honorarium offered for carrying out government duties or for an activity that focuses specifically on the employing agency's responsibilities, policies and programs?
 
 
 20
 (2) Is the honorarium offered to the government employee or family member because of the official position held by the employee?
 
 
 21
 (3) Is the honorarium offered because of the government information that is being imparted?
 
 
 22
 (4) Is the honorarium offered by someone who does business with or wishes to do business with the employee in his or her official capacity?
 
 
 23
 (5) Were any government resources or time used by the employee to produce the materials for the article or speech or make the appearance?
 
 
 24
 S.Rep. No. 29, 102d Cong., 1st Sess., at 8 (1991). While some of the limits may have an amorphous quality about them (such as the one purporting to probe the motive of the honorarium's offeror), there appears no actual experience of difficulty, and one can hypothesize rules of thumb that could constrain [301 U.S.App.D.C. 7] government discretion. Indeed, Congress's use of similar criteria to cover a "series of appearances, speeches, or articles", which § 501(b) as amended allows unless "the subject matter is directly related to the individual's official duties or the payment is made because of the individual's status with the Government", suggests that it regards such lines as entirely workable.
 
 
 25
 While no one questions the authority of Congress to enact broad prophylactic rules, see United Public Workers v. Mitchell, 330 U.S. 75, 102, 67 S.Ct. 556, 570, 91 L.Ed. 754 (1947), a mere "hypothetical possibility" of a corrupt "exchange of political favors" is not enough. FEC v. National Conservative Political Action Committee, 470 U.S. 480, 498, 105 S.Ct. 1459, 1469, 84 L.Ed.2d 455 (1985); see also id. at 500-01, 105 S.Ct. at 1470 (government evidence trying to link corruption to independent expenditures by PACs fails to pass "rigorous" First Amendment standard of review); First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 789, 98 S.Ct. 1407, 1422, 55 L.Ed.2d 707 (1978). Of course where it is in the nature of the evil to be averted that it will be concealed, the court will necessarily expect less evidence. Thus, in upholding the Hatch Act, 5 U.S.C. § 7324 et seq., the Court pointed out that one important concern was to ensure that "Government employees would be free from pressure and from express or tacit invitation to vote in a certain way or perform political chores in order to curry favor with their superiors rather than to act out their own beliefs." United States Civil Service Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 566, 93 S.Ct. 2880, 2890, 37 L.Ed.2d 796 (1973). The potential for such subtle pressure is not only pervasive but inherently difficult to demonstrate or assess; thus, the absence of episodes coming to light is quite consistent with the congressional concern. Similarly, in Buckley v. Valeo, 424 U.S. 1, 26-27, 96 S.Ct. 612, 638, 46 L.Ed.2d 659 (1976), the Court noted that "the full scope of such pernicious practices [as political quid pro quos for large campaign contributions] can never be reliably ascertained," and then went on to observe that "deeply disturbing examples" of such arrangements had surfaced in the 1972 elections. Evidently the Court believed that the surreptitious character of a possible evil could explain the absence of evidence, at least if the evil's existence could reasonably be inferred (as from human nature and the character of the political process). In contrast, here the government does not suggest that the public actually perceives a risk of corruption in receipt by low-level government employees of remuneration for talks on topics that are wholly unrelated to their function, to audiences that are equally unrelated. Nor does it suggest any reason to infer the likelihood of such perceptions, nor any reason why we would not see evidence of such perceptions if they existed.
 
 
 26
 As the apparently excess sweep of § 501(b) is supported by no more than the theoretical possibilities viewed as inadequate in National Conservative Political Action Committee, we cannot find § 501(b) "narrowly tailored".[5]
 
 
 27
 * * *
 
 
 28
 Our final step is to determine the proper remedy. In general, a court should "refrain from invalidating more of the statute than is necessary." Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 684, 107 S.Ct. 1476, 1479, 94 L.Ed.2d 661 (1987) (quoting Regan v. Time, Inc., 468 U.S. 641, 652, 104 S.Ct. 3262, 3268, 82 L.Ed.2d 487 (1984) (plurality opinion)). But the language of § 501(b)--"[a]n individual may not receive any [payment for an appearance, speech or article]" (emphasis added)--does not seem to admit of any construction that would trim off all or even most of the invalid applications to executive branch employees; indeed the government proposes no limiting construction. Articulation of some appropriate nexus test would seem a purely legislative act.
 
 
 29
 This leaves open the possibility, however, that § 501(b)'s application to executive [301 U.S.App.D.C. 8] branch employees may be severable from the remainder of the statute. No party here has argued that § 501(b) is unconstitutional as applied to members of Congress, officers or employees of Congress, or judicial officers or employees, and any such claim would raise quite different considerations. Legislators and judges and their staffs are likely to have to deal with a wide range of issues, so that a party purportedly paying for speech or writing by any of them is more likely to anticipate gaining some advantage, or at least to be seen as hoping for such an advantage. The tradeoff between preventing excess applications and keeping administrative costs low would be different from what it is for executive branch employees.
 
 
 30
 Whether an unconstitutional provision is severable "is largely a question of legislative intent, but the presumption is in favor of severability." Regan v. Time, Inc., 468 U.S. at 653, 104 S.Ct. at 3269. " 'Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.' " Buckley v. Valeo, 424 U.S. at 108-09, 96 S.Ct. at 677 (quoting Champlin Refining Co. v. Corporation Comm'n of Oklahoma, 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932)).
 
 
 31
 Section 501(b) does not contain a severability clause, and the legislative history yields no direct evidence of intent concerning severability. Thus, we must ask whether there is anything in the history indicating that Congress would have enacted the honorarium ban if it had been aware of its unconstitutionality as applied to executive branch employees. Alaska Airlines, Inc. v. Brock, 480 U.S. at 685, 107 S.Ct. at 1480.
 
 
 32
 In this case the evidence is that it clearly would have gone forward as to the legislative branch and in all probability as to the judicial. First, the floor debates indicate that Congress was principally concerned that the receipt of honoraria by Members of Congress created the appearance of influence-buying. Speakers throughout the debates refer to "Members of Congress" in explaining why the honorarium ban was necessary. See, e.g., 135 Cong.Rec. H8756 (daily ed. Nov. 16, 1989). For example, at one point a congressman noted that "the elimination of honoraria will have a beneficial impact on the public's perception of the integrity of Congress as an institution." Id. at H8763 (emphasis added). Another congressman noted that the statute addressed "the underlying sources of abuse in the current income system for public employees, in particular for Members of Congress." Id. at H8767 (emphasis added).
 
 
 33
 Similarly, the Report of the Bipartisan Task Force, issued after the Act was passed, also indicates a primary concern with the receipt of honoraria by Members of Congress. In describing the background of the ban the report states that "substantial payments to a Member of Congress for rendering personal services to outside organizations presents a significant and avoidable potential for conflict of interest." Id. at H9256. The report continues by describing how the increase in Members' honoraria income in recent years "has heightened the public perception that honoraria is [sic] a way for special interests to try to gain influence or buy access to Members of Congress," id. at H9257, and noting the "growing concern that the practice of acceptance of honoraria by Members ... creates serious conflict of interest problems and threatens to undermine the institutional integrity of Congress." Id. Nowhere did members of Congress display any specific concern with the receipt of honoraria by executive branch employees, much less indicate that the application of the ban to them was a condition of the bill's passage.
 
 
 34
 Further, the honorarium ban was adopted as part of a package of which a key ingredient was a sharp increase in the salary of members of Congress, judges, and a limited class of senior executive branch officials. See id. at H9254, H9268-69 (describing Title III of the Act). The one clearly detectable interdependency between segments of the statute was between the ban and the salary increase. [301 U.S.App.D.C. 9] See, e.g., id. at H8756 (statement of Congressman Packard); id. at H8766/1-2; id. at H8767; id. at H9254 (stating that the pay raise would be given "as part of the ban on honoraria"). Striking down the application of the honorarium ban as to members of Congress and judges--while leaving their salary increases in place (a constitutional necessity for the latter)--would truly violate the intent of Congress.
 
 
 35
 Nominally, the invalidation of the honorarium ban as to executive branch employees upsets some of the intended balance (the salary increase for senior officials survives, the honorarium ban falls). But as other, severe restrictions have applied to senior executive branch officials anyway, see, e.g., E.O. 12674 (April 12, 1989)[6] (providing that "[no] employee who is appointed by the President to a full-time noncareer position in the executive branch ... shall receive any earned income for any outside employment or activity performed during that Presidential appointment"), the effect on senior officials benefitting from the salary increase may well be nil.
 
 
 36
 We cannot, as a technical matter, achieve the intended severance simply by striking the words "officer or employee" from § 501(b), as that would invalidate the ban beyond the executive branch. See § 505(3) (defining "officer or employee" as "any officer or employee of the government", and in context indisputably encompassing employees of Congress and judicial officers and employees). However, given the far greater congressional interest in banning honoraria for the legislative and judicial branches, we think it a proper form of severance to strike "officer or employee" from § 501(b) except in so far as those terms encompass members of Congress, officers and employees of Congress, judicial officers and judicial employees. Compare 5 U.S.C. app. 6, § 101(f)(9)-(12) (definition of "officers and employees" in related ethics legislation, encompassing persons in all three branches but distinguishing between them). This severance is similar to the type employed by the Court in Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985). There the Court "pretermit[ed]" the issue of whether "lust" might be construed as referring only to morbid and shameful interests (rather than also encompassing " 'good, old-fashioned, healthy' interest in sex"), id. at 498-501, 105 S.Ct. at 2798-2800, and instead severed from the statute any meaning of lust other than shameful and morbid interests, id. at 506-07, 105 S.Ct. at 2803.
 
 The decision of the district court is
 
 37
 Affirmed.
 
 RANDOLPH, Circuit Judge, concurring:
 
 38
 I join fully Judge Williams' opinion. I write separately because it seems worth pointing out that the dissent has mixed up two different questions: who may bring a facial constitutional challenge to a statute? and when may such a challenge succeed? The first goes to standing, the second to the merits. Established Supreme Court doctrine on both questions depends on whether the facial attack rests on First Amendment free-speech grounds. If it does, the plaintiff need not show that his speech deserves First Amendment protection; he has standing to contest the statute's constitutionality with respect to the speech of others. See, e.g., New York v. Ferber, 458 U.S. 747, 767-73, 102 S.Ct. 3348, 3359-63, 73 L.Ed.2d 1113 (1982); Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 634, 100 S.Ct. 826, 834, 63 L.Ed.2d 73 (1980); Gooding v. Wilson, 405 U.S. 518, 520-21, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972). As far as the merits are concerned, the usual rule is that a facial attack will not be sustained unless there is no set of circumstances in which the statute could constitutionally be applied. See, e.g., United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987); National Fed'n of Fed. Employees v. Greenberg, 983 F.2d 286, 292 (D.C.Cir.1993). [301 U.S.App.D.C. 10] In free-speech cases, the rule, an aspect of the "overbreadth" doctrine, is nearly the opposite: a statute is invalid in all its applications if it is invalid in any of them, or at least enough to make it "substantially" overbroad. See, e.g., Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480, 490-501, 105 S.Ct. 1459, 1465-70, 84 L.Ed.2d 455 (1985); First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 786-95, 98 S.Ct. 1407, 1421-26, 55 L.Ed.2d 707 (1978); Buckley v. Valeo, 424 U.S. 1, 44-51, 96 S.Ct. 612, 646-50, 46 L.Ed.2d 659 (1976) (per curiam). The dissent garbles these distinctions and winds up with the following untenable proposition--if the parties before the court are alleging that the statute unconstitutionally restricts their freedom of speech, rather than the speech of absent third parties, the statute is unconstitutional on its face only if it is unconstitutional in all its applications to them. In other words, § 501(b) of the Ethics in Government Act would be facially invalid if the only plaintiff were a GS-14 Labor Department employee making money from articles about government labor policy. But in this case it is not facially unconstitutional, according to the dissent, because everyone to whom the statute could be unconstitutionally applied is before the court. This is the equivalent of saying that if you would not have had standing in a non-free speech case, you win on the merits; but if you have standing even under the usual rules, you lose.
 
 
 39
 As to the analysis under Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the dissent thinks the ban on federal employees' receiving payment for writing articles imposes a "moderate burden at most." Dr. Johnson saw things rather differently: "No man but a blockhead ever wrote, except for money." 4 BOSWELL'S LIFE OF JOHNSON 29 (A. Birrell ed. 1904). Depending on what constitutes a blockhead, the aphorism may be tautological or too broad. Boswell himself had his doubts (id.). But the general proposition--that depriving authors of payment for their works significantly discourages writing--is one of the premises of the Supreme Court's decision in Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board, --- U.S. ----, ----, ----, 112 S.Ct. 501, 508-09, 511-12, 116 L.Ed.2d 476 (1991); see also --- U.S. at ----, 112 S.Ct. at 512 (Kennedy, J., concurring). If Sanjour v. Environmental Protection Agency, 984 F.2d 434 (D.C.Cir.1993), stands for a different proposition, or if it too confuses the merits with standing and ignores the differences between facial attacks based on the First Amendment and those based on other constitutional provisions, it warrants reconsideration.
 
 SENTELLE, Circuit Judge, dissenting:
 
 40
 Although I share my colleagues' concerns that this statute may not be the best conceivable vehicle for achieving the underlying congressional aim, I dissent from their conclusion that it is unconstitutional. My dissent rests both on concerns about the precedent the Court creates today and on what I perceive to be its inconsistency with existing precedent, both of the Supreme Court and this Circuit.
 
 
 41
 I address first the inconsistency of the Court's holding today with existing law on facial challenges; second, the application of the Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), standard to the question of the constitutionality of the honorarium ban; and, third, my discreet disagreement with the "severance" exercised by the majority on the statutory term "officer or employee."
 
 I.
 
 42
 I fear that the majority opinion may lead litigants to conclude that whenever a statute is unconstitutional "as-applied" to parties before the court it is also "facially" invalid. See Majority Opinion ("Maj. Op.") at 1275 & n. 3 (sustaining appellees' facial challenge because the statute is unconstitutionally overbroad as to them and "the [Supreme] Court allows facial overinclusiveness claims by parties whose conduct may well be constitutionally protected"). In fact, though it is often the case, as in [301 U.S.App.D.C. 11] Austin v. Michigan State Chamber of Commerce, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), for example, that a plaintiff who asserts the unconstitutionality of a statute as applied to him is also heard to challenge the statute on its face, see Sanjour v. EPA, 984 F.2d 434, 444 n. 10 (D.C.Cir.1993); National Fed'n of Fed. Employees v. Greenberg, 983 F.2d 286, 288 (D.C.Cir.1993), that truism does not mean that facial challenges may be entertained and sustained without limitation.
 
 
 43
 Instead, the Supreme Court has held that statutes may be facially invalidated only in two "narrow" circumstances. As the Court in New York State Club Ass'n v. New York City, 487 U.S. 1, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988), recently made clear:
 
 
 44
 Although such facial challenges are sometimes permissible and often have been entertained, ... to prevail on a facial attack the plaintiff must demonstrate that the challenged law either "could never be applied in a valid manner" or that even though it may be validly applied to the plaintiff and others, it nevertheless is so broad that it "may inhibit the constitutionally protected speech of third parties."
 
 
 45
 Id. at 11, 108 S.Ct. at 2233 (quoting Members of the City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 798, 104 S.Ct. 2118, 2125, 80 L.Ed.2d 772 (1984)).
 
 
 46
 New York State Club Ass'n also teaches that different substantive criteria govern each of the two categories of permissible facial challenges. "[T]he first kind of facial challenge will not succeed unless the court finds that 'every application of the statute create[s] an impermissible risk of suppression of ideas.' " Id. (quoting Taxpayers for Vincent, 466 U.S. at 798 n. 15, 104 S.Ct. at 2125 n. 15). On the other hand, "the second kind of facial challenge will not succeed unless the statute is 'substantially' overbroad, which requires the court to find 'a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court.' " Id. (quoting Taxpayers for Vincent, 466 U.S. at 801, 104 S.Ct. at 2126). Neither type of facial challenge, however, succeeds unless "there is no core of easily identifiable and constitutionally proscribable conduct that the [challenged] statute prohibits." Secretary of State of Maryland v. Joseph H. Munson Co., 467 U.S. 947, 965-66, 104 S.Ct. 2839, 2851-52, 81 L.Ed.2d 786 (1984); see also Sanjour v. EPA, 984 F.2d 434, 444 & n. 11 (D.C.Cir.1993) (same).
 
 
 47
 Limiting facial challenges in this manner may seem to manifest an excessive focus on semantics or an outright hostility to constitutional rights. But, as the Supreme Court has explained, the limits on permissible facial challenges "rest on more than the fussiness of judges." Broadrick v. Oklahoma, 413 U.S. 601, 610, 93 S.Ct. 2908, 2914, 37 L.Ed.2d 830 (1973). They are, quite simply, a requirement of the limitations inherent in Article III. "[U]nder our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws." Id. at 611, 93 S.Ct. at 2915 (citing Younger v. Harris, 401 U.S. 37, 52, 91 S.Ct. 746, 754, 27 L.Ed.2d 669 (1971)). Stated differently, "[t]he judicial power does not extend to issuing 'an opinion advising what the law would be upon a hypothetical state of facts.' " American Library Ass'n v. Barr, 956 F.2d 1178, 1189 (D.C.Cir.1992) (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937)).
 
 
 48
 Moreover, far from disadvantaging constitutional rights, these limits reflect a sensible accommodation of constitutional rights and the legitimate interests of government. Generally speaking, the Supreme Court has deemed as-applied challenges sufficient to protect precious constitutional rights. See Broadrick, 413 U.S. at 611, 93 S.Ct. at 2915. If a plaintiff demonstrates that a law impermissibly encroaches on protected activities, courts "invalidate[ ] the statute, not in toto, but only as applied to those activities," and thereby "[t]he law is refined by preventing improper applications on a case-by-case basis." Munson, 467 U.S. at 977, 104 S.Ct. at 2857 (Rehnquist, J., dissenting). That approach, in sharp contrast to facial invalidation, has the advantage of allowing statutes to stand [301 U.S.App.D.C. 12] as to the legitimate objects of legislative action while simultaneously exempting constitutionally protected activity from the statutes' reach. Id.
 
 
 49
 Only in two circumstances, representing the two exceptions elucidated in New York State Club Ass'n, has the Supreme Court found no justification for limiting plaintiffs to as-applied challenges. The first is review of a statute that has no constitutional application. Allowing facial challenges in that situation rests on the sound notion that "there is no reason to limit challenges to case-by-case 'as-applied' challenges when the statute ... in all of its applications falls far short of constitutional demands." Munson, 467 U.S. at 966 n. 13, 104 S.Ct. at 2852 n. 13. The second arises when a statute is so overbroad as to the rights of absent third parties that "there is no core of easily identifiable and constitutionally proscribable conduct that the statute prohibits." Id. at 965-66 n. 13, 104 S.Ct. at 2851-52 n. 13; see also id. at 964-65, 104 S.Ct. at 2850-51. In such a situation, as-applied challenges have been viewed as insufficient to protect First Amendment rights because such a law's "very existence may cause others not before the court to refrain from constitutionally protected speech or expression." Broadrick, 413 U.S. at 612, 93 S.Ct. at 2915.
 
 
 50
 In view of the existing precedent, a lower court addressing a facial challenge based on insufficient tailoring can hardly avoid distinguishing between the two types of facial challenges.[1] In my view, the present challenge fits neither category, and that forecloses us from striking down the honorarium ban on its face. Quite clearly, appellees' facial challenge cannot succeed as a claim that the honorarium ban is unconstitutional in all of its possible applications. As the majority states, "[n]o party here has argued that § 501(b) is unconstitutional as applied to members of Congress, officers or employees of Congress, or judicial officers or employees." Maj. Op. at 1278. Indeed, appellees' brief expressly disclaims any claim that the ban is unconstitutional as to all those affected: "Plaintiffs are career executive branch employees, and they express no opinion as to the constitutionality of the honoraria ban as applied to Members of Congress, the judiciary, and high-level political appointees in the executive branch." Appellees' Br. at 36 n. 21.
 
 
 51
 Nor, for two reasons, does the appellees' facial challenge fall within the second category of permissible facial challenges. First, appellees' tailoring challenge does not constitute a cognizable overbreadth challenge under the second type of facial challenge. A court "may not apply overbreadth analysis to a claim 'that [a] statute is overbroad precisely because it applies to him--the plaintiff who is before us.' " Sanjour, 984 F.2d at 443 (quoting Moore v. City of Kilgore, 877 F.2d 364, 390-92 (5th Cir.), cert. denied, 493 U.S. 1003, 110 S.Ct. [301 U.S.App.D.C. 13] 562, 107 L.Ed.2d 557 (1989)). In so holding, Sanjour gave effect to the Supreme Court's explicit holding that "the second kind of facial challenge will not succeed unless the statute is 'substantially' overbroad, which requires the court to find 'a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court.' " New York State Club Ass'n v. New York City, 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1 (1988) (quoting Members of the City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 801, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984)) (emphasis added).[2]
 
 
 52
 Here, appellees do not argue that the honorarium ban will compromise the rights of absent third parties. The parties whose rights are being asserted--Executive Branch employees below GS-16 and the individually named plaintiffs--are before the Court.[3] The District Court properly certified appellee NTEU to represent the class in question under Rule 23(b)(2) of the Federal Rules of Civil Procedure. Given the nature of a class action, all of the members of the class--not just the class representative--are before the Court. See FED.R.CIV.P. 23(c)(3) (providing that "[t]he judgment in an action maintained as a class action under subdivision (b)(1) or (b)(2), whether or not favorable to the class, shall include ... members of the class") (emphasis added); see generally 7B CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1789, at 247 (1986) (explaining that "a member of the class in a Rule 23 suit is considered to be a party in representation, and will be bound to the same extent as an actual party").[4] Consequently, we have before us, not just the individually named plaintiffs, but all Executive Branch employees below GS-16.
 
 
 53
 At no time in this litigation have the rights of anyone other than the individually named plaintiffs and the certified class been asserted. As a result, appellees' "overbreadth" challenge is based exclusively on a claim that the honorarium ban is overbroad precisely because it applies to them, and the instant case involves the assertion of first-party rights of parties presently before the Court. Appellees' facial challenge, therefore, fails on the merits, in view of controlling precedent from the Supreme Court and this circuit which place cases such as this one outside the substantive bounds of the second type of facial challenge, i.e., the First Amendment overbreadth doctrine. See New York State Club Ass'n v. New York City, 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1 (1988) (holding that a claim under the First Amendment overbreadth doctrine "will not succeed unless ... the [challenged] statute [301 U.S.App.D.C. 14] itself will significantly compromise recognized First Amendment protections of parties not before the Court"); Sanjour v. EPA, 984 F.2d at 442 (D.C.Cir.1993) (same); see also Moore v. City of Kilgore, 877 F.2d 364, 390-92 (5th Cir.) (same), cert. denied, 493 U.S. 1003, 110 S.Ct. 562, 107 L.Ed.2d 557 (1989). By applying the overbreadth doctrine to appellees' facial challenge, the majority has loosed the overbreadth doctrine from its moorings, in direct contravention of the Supreme Court's pointed admonition that "[t]he scope of the First Amendment overbreadth doctrine ... must be carefully tied to the circumstances in which facial invalidation of a statute is truly warranted." New York v. Ferber, 458 U.S. 747, 769, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982).
 
 
 54
 Second, under Sanjour v. EPA, 984 F.2d 434 (D.C.Cir.1993), and the cases on which it relied,[5] facial invalidation is proper under the second type of facial challenge only if "there is no core of easily identifiable and constitutionally proscribable conduct that the statute prohibits." Id. at 444 & n. 11 (internal quotation marks omitted). Not only have appellees failed to make that showing, the majority correctly holds that the honorarium ban is constitutional as to Congress and the judicial branch, see Maj. Op. at 1278, and concedes that "for some of § 501(b)'s applications--perhaps many of them--the Pickering balance supports its constitutionality." Id. at 1274.
 
 
 55
 Although the fact that the ban has constitutionally permissible applications does not mean that the ban is narrowly tailored, see Ward v. Rock Against Racism, 491 U.S. 781, 800, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989), it does necessarily mean that the statute may not be invalidated on its face, assuming the constitutionally permissible applications are "easily identifiable."[6] See, e.g., Secretary of State of Maryland v. Joseph H. Munson Co., 467 [301 U.S.App.D.C. 15] U.S. 947, 965, 104 S.Ct. 2839, 2851, 81 L.Ed.2d 786 (1984); New York v. Ferber, 458 U.S. 747, 770 n. 25, 102 S.Ct. 3348, 3361 n. 25, 73 L.Ed.2d 1113 (1982); United States Civil Serv. Comm'n v. Letter Carriers, 413 U.S. 548, 580-81, 93 S.Ct. 2880, 2897-98, 37 L.Ed.2d 796 (1973). Here, the honorarium ban does have an easily identifiable core of constitutional application--at the very least, it may constitutionally be applied to judges and their staff and Members of Congress and their staff. See Maj. Op. at 1279. Thus, the ban cannot be invalidated on its face consistently with the above cases.
 
 
 56
 For the foregoing reasons, sustaining appellees' facial challenge runs counter to the mandate of several Supreme Court cases. See New York State Club Ass'n v. New York City, 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1 (1988); Secretary of State of Maryland v. Joseph H. Munson Co., 467 U.S. 947, 964-65, 967 n. 13, 104 S.Ct. 2839, 2850-51, 2852 n. 13, 81 L.Ed.2d 786 (1984); Members of the City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 801, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984); New York v. Ferber, 458 U.S. 747, 769, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982). It also runs counter to this Circuit's decision in Sanjour v. EPA, 984 F.2d 434 (D.C.Cir.1993). Further, it creates a conflict with the Fifth Circuit. See Moore v. City of Kilgore, 877 F.2d 364, 390-92 (5th Cir.), cert. denied, 493 U.S. 1003, 110 S.Ct. 562, 107 L.Ed.2d 557 (1989). "Believing that in this case the overbreadth doctrine is not merely 'strong medicine,' but 'bad medicine,' " Munson, 467 U.S. at 975, 104 S.Ct. at 2856 (Rehnquist, J., dissenting) (citation omitted), I cannot join the majority's facial invalidation of the honorarium ban.
 
 II.
 
 57
 I agree with the majority that Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), is the standard by which the constitutionality of the honorarium ban must be judged. Under the Pickering test, we must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. at 568, 88 S.Ct. at 1734.
 
 
 58
 I differ from the majority as to both sides of the balance. On the one hand, I find the burden the honorarium ban imposes on appellees' First Amendment rights lighter than the majority perceives; the weight of the government's interest in avoiding the appearance of impropriety or corruption, I find much, much greater.
 
 A. The Employees' Interest
 
 59
 The majority holds, correctly, that financial disincentives on speech do burden First Amendment rights and the fact that such disincentives do not prohibit expressive activity only affects the weight of the burden. See Maj. Op. at 1273. This Court recently held as much. See Sanjour v. EPA, 984 F.2d 434, 441 (D.C.Cir.1993) (holding that financial disincentives on speech burden First Amendment rights for purposes of the Pickering balance). I find the majority's conclusion as to the effect of that holding on the present controversy inconsistent with Circuit precedent.
 
 
 60
 In Sanjour this Court addressed the constitutionality of a financial disincentive on speech that closely resembles the honorarium ban in certain respects. There, the Environmental Protection Agency ("EPA") issued an Ethics Advisory allowing employees to accept expense reimbursement from nonfederal sources if they spoke "officially"--that is, on behalf of the agency--but not "unofficially." The plaintiffs in Sanjour claimed that the Ethics Advisory all but eliminated their ability to engage in expressive activity, given that they, as federal employees, generally are of modest means. Indeed, the dissent in Sanjour took the argument one step further, arguing that the Advisory "would apply even if the employee loses income because he has taken uncompensated leave to give the speech." Sanjour, 984 F.2d 434, 456 n. 6 (Wald, J.).
 
 
 61
 In spite of those considerations, Sanjour rejected the plaintiffs' contention that the [301 U.S.App.D.C. 16] Ethics Advisory "imposes a severe burden on the First Amendment rights of EPA employees" and held that the burden was "moderate, though not insignificant." Sanjour, at 441. In so ruling, Sanjour stressed that the Advisory "allows [employees] to speak whenever and on whatever topics they choose." Id. at 440.
 
 
 62
 Given the decision in Sanjour, we cannot consistently hold that the honorarium ban imposes more than a moderate burden at most on appellees' First Amendment rights.[7] Like the EPA Ethics Advisory, the honorarium ban does not prohibit speech, as even the majority is constrained to concede. See Maj. Op. at 1273. Moreover, the ban imposes significantly less of a burden on appellees' First Amendment rights than did the Ethics Advisory upheld in Sanjour. Unlike the Ethics Advisory, the ban allows employees to recover all of the costs they necessarily incur in expressive activity. The ban only prevents employees from profiting from their outside activities.
 
 
 63
 As then-Judge Thomas wrote for the Court in our prior decision in this case:
 
 
 64
 Many of the [employees] state that they cannot afford to pay the expenses they incur in connection with their First Amendment activities. The ban does not preclude them from recovering these costs, however. The Act and the OGE regulations expressly exclude "actual and necessary travel expenses" from the definition of an honorarium. An employee need not receive a direct reimbursement to recover his travel costs; he complies with the honorarium ban as long as he does not earn income for his speaking and writing in excess of his actual and necessary travel expenses. The regulations also exclude from the honorarium ban "[a]ctual expenses in the nature of typing, editing and reproduction costs," and "[m]eals or other incidents of attendance, such as waiver of attendance fees or course materials furnished as part of the event at which an appearance or speech is made." Fairly read, these provisions encompass all of the necessary expenses that the [employees] incur.
 
 
 65
 National Treasury Employees Union v. United States, 927 F.2d 1253, 1255 (D.C.Cir.1991) (emphasis added) (citations omitted). Appellees thus are entirely off the mark in their contention that the honorarium ban "severely handicaps the ability of all but the independently wealthy to seriously pursue writing and speaking activities." Appellees' Br. at 22.
 
 
 66
 There are, of course, two senses in which NTEU's assertion that the honorarium ban severely burdens free speech rights is theoretically correct, but nonetheless unavailing. First, it may be argued that because appellees' conduct enjoys First Amendment protection, any burden on those rights is necessarily severe for Pickering purposes. See Maj. Op. at 1273-74 (failing to specify the particular weight of the employee's side of the balance). That assumption places the analytical cart before the horse: "[C]onduct of government employees is 'protected' when, after balancing the interests of employee and employer, it is concluded that the employee's interest in speech outweighs the government's interest as an employer in efficient management." Foster v. Ripley, 645 F.2d 1142, 1148 (D.C.Cir.1981). Moreover, such an absolutist approach to the employee's side of the balance would be inconsistent with the Supreme Court's directive [301 U.S.App.D.C. 17] that "[t]he problem in any case is to arrive at a balance between" the competing interests. Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Assuming that any burden on free speech rights is severe renders Pickering a balancing test in name only.
 
 
 67
 Second, the honorarium ban might be said to be severe in its effect on appellees' rights to the extent they depend on honoraria to pay their bills. There is evidence in the record suggesting that at least some Executive Branch employees below GS-16 are financially dependent on the income they have received for their expressive activity. See, e.g., Affidavit of John C. Shelton p 8, at 2 (stating that "based on my current financial situation, I will not be able to continue making payments on my mortgage if I have to give up the income from my writing"). However, to the extent that appellees may be financially dependent on honoraria, the weight of the government interest in avoiding the appearance of impropriety or corruption is greatly bolstered. See infra p. 1292.
 
 
 68
 In view of the foregoing, the honorarium ban only has a moderate impact on appellees' First Amendment rights. See generally Snepp v. United States, 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (per curiam) (holding that the Central Intelligence Agency could, consistent with the First Amendment, impose a constructive trust denying a former employee the proceeds from expressive activity that harmed a substantial government interest). To the extent the majority accords the employees' side of the balance greater weight, I disagree.
 
 B. The Government's Interest
 
 69
 The majority concedes that the government has a "strong" interest in avoiding the appearance of impropriety or corruption in the public service. Maj. Op. at 1274. I would style the identified government interests "compelling." See Federal Election Comm'n v. National Right to Work Comm., 459 U.S. 197, 208, 103 S.Ct. 552, 559, 74 L.Ed.2d 364 (1982); Buckley v. Valeo, 424 U.S. 1, 26-29, 96 S.Ct. 612, 638-39, 46 L.Ed.2d 659 (1976) (per curiam). The majority holds that interest sufficiently heavy "to outweigh government employees' interest in engaging in speech for compensation where the compensation creates ... an appearance [of impropriety]." Maj. Op. at 1274 (emphasis omitted). However, the majority concludes that this balancing "will not save section 501(b) ... if it is either 'overbroad' or manifests a want of 'narrow tailoring.' " Id. at 1274. The majority thereafter rejects the result of the Pickering balance insofar as the statute applies beyond Members of Congress, officers and employees of Congress, judicial officers and judicial employees. Apparently, the majority does not find the appearance-of-impropriety weight to sit on the government side of the balance in any other cases. I do not find the majority's justifications for rejecting the applicability of its initial Pickering balancing to Executive Branch officers and employees to be convincing.
 
 
 70
 First, perceiving a lack of legislative or record evidence supporting the legislative premise that accepting honoraria may give rise to an appearance of impropriety or corruption, the majority dismisses as "hypothetical" the risk of either appearance in this case. Maj. Op. at 1276-77. Second, the majority argues that honoraria cannot give rise to an appearance of impropriety or corruption, unless (1) the payor has a conflict of interest with the employee's employing agency or (2) the subject matter of the employee's expressive activity bears a nexus with the employee's government job. I address each of these arguments below.
 
 1. The Majority's Evidence Requirement
 
 71
 The majority argues that the honorarium ban must be deemed not to advance the asserted government interest because "[t]he government points neither to improprieties in the pre-s 501(b) era that would have been prevented by § 501(b) but not by the prior regulations, nor to any serious [301 U.S.App.D.C. 18] enforcement or line-drawing costs associated with those regulations." Maj. Op. at 1276. For two reasons, the majority's reasoning does not justify its result.
 
 
 72
 In the first place, I do not agree that the government was required to point to specific evidence of the ill effects of honoraria in the Executive Branch. It is true, as the majority points out, that in First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), the Court refused to consider the defendant's argument that corporate advocacy of political causes would undermine the democratic process, on the ground that the defendant's claim was not "supported by record or legislative findings." Id. at 789, 98 S.Ct. at 1422. However, the Supreme Court has restricted Bellotti's demand for such findings to cases where the rights being asserted are "[r]ights of political expression and association." In re Primus, 436 U.S. 412, 434 n. 27, 98 S.Ct. 1893, 1906 n. 27, 56 L.Ed.2d 417 (1978).[8]
 
 
 73
 Here, while appellees' expressive activities may pertain to matters of public concern, see Maj. Op. at 1273, they do not involve political expression. Appellees have written or spoken about art, Russian history, movies, plays and other interesting topics not remotely involving politics.[9] See id. at 1275. Therefore, the mere fact that the government adduced no record or legislative evidence of Executive Branch improprieties does not justify according no weight to the governmental interests underlying the honorarium ban.[10]
 
 
 74
 Long before Bellotti, the Supreme Court made clear that "[f]or regulation of employees it is not necessary that the act regulated be anything more than an act reasonably deemed by Congress to interfere with the efficiency of the public service." United Public Workers v. Mitchell, 330 U.S. 75, 101, 67 S.Ct. 556, 570, 91 L.Ed. 754 (1947). Later, with the full development of Pickering cases into a discrete area of First Amendment law, the Supreme Court reinforced United Public Workers's holding. In 1983, the Court ruled that a governmental employer is not required to "tolerate action which he reasonably believe[s] would" cause the harm against which the prophylactic measure is directed. [301 U.S.App.D.C. 19] Connick v. Myers, 461 U.S. 138, 154, 103 S.Ct. 1684, 1693, 75 L.Ed.2d 708 (1983); see also Sanjour v. EPA, 984 F.2d 434, 440 (D.C.Cir.1993) (holding that "employer is not required to tolerate action which it reasonably believed would cause harm") (internal quotation marks and brackets omitted); Hubbard v. EPA, 949 F.2d 453, 460 (D.C.Cir.1991) (same), vacated in part on other grounds, 982 F.2d 531 (D.C.Cir.1992) (en banc). Indeed, we have construed a post-Connick Supreme Court case, Rankin v. McPherson, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), to allow us to "draw[ ] reasonable inference of harm" from proscribed employee activities and therefore, on that ground, rejected an argument that "objective evidence of concrete harm" is required. Hall v. Ford, 856 F.2d 255, 260-61 (D.C.Cir.1988).
 
 
 75
 I would hold these standards, rather than Bellotti, to be controlling here, and conclude that Congress's determination that only a complete ban on honoraria can effectively avoid the ill effects of honoraria is reasonable. After all, as the record reveals, following a two-year study of Executive Branch agencies' enforcement of prior ethics laws relating to honoraria, the Government Accounting Office ("GAO") concluded that federal ethics enforcement has been consistently impeded by agencies' "overly permissive policies and practices." Report to the Chairman, Senate Subcomm. on Fed. Servs., Post Office and Civil Serv., Comm. on Governmental Affairs, Employee Conduct Standards: Some Outside Activities Present Conflict-of-Interest Issues, at 9 (Feb. 1992) ("GAO Report"). Further, the OGE's efforts to ensure that ethics laws were more evenly enforced had been far from successful. See id. at 2 (reporting that "agencies did not always implement OGE's recommendations"); see also id. at 12-13 (same). Because of these failures to enforce ethics regulations, "agencies [had] approved activities that were questionable as to the appropriateness of accepting compensation" from sources outside the federal government. Id. at 9. The GAO Report thus supports the reasonableness of Congress's belief that only a comprehensive, categorical ban on honoraria can effectively prevent the problems of evisceration and underenforcement inherent in the prior system of patchwork ethics laws. See infra at 1291 (summarizing prior ethics laws).
 
 
 76
 Moreover, in enacting the ban, Congress had before it evidence that allowing employees in the Executive Branch to accept honoraria can give rise to an appearance of impropriety or corruption. Two separate blue-ribbon commissions, the Quadrennial Salary Commission and the Wilkey Commission, conducted hearings examining the actual or potential impact of allowing federal employees, including Members of Congress, to accept honoraria. Though separate, both commissions reached the same conclusion--accepting honoraria creates an appearance of impropriety that jeopardizes the public's faith in their government and its employees. See To Serve With Honor: Report of the President's Commission on Federal Ethics Law Reform, at 35, 36 (Mar. 1989) (hereinafter "Wilkey Commission Report ") (stating that "[h]onoraria paid to officials can be a camouflage for efforts by individuals or entities to gain the officials' favor" and that "the current ailment [caused by accepting honoraria] is a serious one"); Fairness for Our Public Servants: Report of the 1989 Commission on Executive, Legislative and Judicial Salaries, at 24 (Dec. 1988) (hereinafter "Quadrennial Commission Report ") (concluding that "[t]he potential for abuse or the appearance of abuse is obvious to the public" and that public confidence in the government "is threatened by the steady growth of this practice [honoraria]," particularly in Congress).
 
 
 77
 Although both commissions relied principally on the congressional experience, which revealed a venerated institution of government appearing corrupt in the eyes of the public by virtue of honoraria, they recognized that what has happened in Congress can happen in the judicial and executive branches. As the Wilkey Commission explained,
 
 
 78
 Although we are aware of no special problems associated with the receipt of honoraria within the judiciary, the Commission--[301 U.S.App.D.C. 20] in the interest of alleviating abuses within the legislative branch and in applying equitable limitations across the government--joins the Quadrennial Commission in recommending the enactment of legislation to ban the receipt of honoraria by all officials and employees in all three branches of government.
 
 
 79
 Wilkey Commission Report, at 35-36. Accordingly, both commissions recommended that honoraria should be completely abolished in all three branches of the federal government. See id.; Quadrennial Commission Report, at 24 ("strongly recommend[ing]" that "the practice of honoraria in all three branches be terminated by statute" and that "[t]he prohibition [on honoraria] should be extended to all Congressional and judicial staff").
 
 
 80
 Given these reports of the Quadrennial and Wilkey Commissions, Congress could reasonably believe that employee acceptance of honoraria can create--and in fact has created--an appearance of impropriety or corruption in the eyes of the public. In my view, given the reasonableness of that legislative premise, we are required to assign the government interest compelling weight in the Pickering balance. See Connick v. Myers, 461 U.S. 138, 154, 103 S.Ct. 1684, 1693, 75 L.Ed.2d 708 (1983); United Public Workers v. Mitchell, 330 U.S. 75, 101, 67 S.Ct. 556, 570, 91 L.Ed. 754 (1947); Sanjour v. EPA, 984 F.2d 434, 440 (D.C.Cir.1993) (same); Hubbard v. EPA, 949 F.2d 453, 460 (D.C.Cir.1991), vacated in part on other grounds, 982 F.2d 531 (D.C.Cir.1992) (en banc).
 
 
 81
 Wholly apart from the majority's erroneous refusal to give effect to Congress's reasonable belief that a complete ban on honoraria was necessary, the majority's demand for evidence of honoraria-induced harm in the Executive Branch which was not adequately addressed by prior law presses judicial review beyond its proper bounds. As the Supreme Court has commanded, courts should not "second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil to be feared." Federal Election Comm'n v. National Right to Work Comm., 459 U.S. 197, 210, 103 S.Ct. 552, 561, 74 L.Ed.2d 364 (1982); see also Buckley v. Valeo, 424 U.S. 1, 27, 96 S.Ct. 612, 638, 46 L.Ed.2d 659 (1976) (per curiam) (upholding campaign contribution limitations designed to address the real or perceived problem with quid pro quo arrangements even though bribery laws and disclosure requirements already dealt with that concern). That is especially so, given that the honorarium ban is but the latest step in Congress's careful adjustment of federal ethics laws. See National Right to Work Comm., 459 U.S. at 209, 103 S.Ct. at 560 (stating that courts owe "considerable deference" to Congress's "careful legislative adjustment of the federal electoral laws, in a cautious advance, step by step") (internal quotation marks omitted).
 
 
 82
 In rejecting Congress's assessment that prior ethics laws were inadequate to avoid honoraria-induced appearances of impropriety, the majority relies on Boos v. Barry, 485 U.S. 312, 324-29, 108 S.Ct. 1157, 1165-68, 99 L.Ed.2d 333 (1988), for the proposition that "the 'most useful starting point' for assessing whether a statute is narrowly tailored is to 'compare it with an analogous statute.' " Maj. Op. at 1276. True, in that decision, the Supreme Court did compare the statute challenged as not narrowly tailored for the asserted governmental interest to an analogous statute (and its legislative history). The challenged statute, enacted in 1938, was sweeping in its reach and, the Court concluded, extended to expressive activities. 485 U.S. at 329, 108 S.Ct. at 1168. In contrast, the statute deemed analogous, which was enacted in 1972, was considerably narrower, in that it contained a provision stating that " '[n]othing contained in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the first amendment.' " Id. at 325, 108 S.Ct. at 1166 (quoting Pub.L. No. 92-539, § 301(e), 86 Stat. 1073 (1972)). The analogous statute was further narrowed in 1976, when Congress deleted a provision that it felt " 'raise[d] serious Constitutional questions because it appear[ed] to include within its purview conduct and speech protected by the First Amendment.' " Id. at 326, 108 [301 U.S.App.D.C. 21] S.Ct. at 1166 (quoting S.Rep. No. 1273, 94th Cong., 2d Sess. 8 n. 9 (1976)).
 
 
 83
 The comparison between the challenged law and the analogous statute, according to the Court, revealed that "Congress has determined that [the challenged statute] adequately satisfies the Government's interest." Id. Deferring to that determination by Congress, the Court "conclude[d] that the availability of alternatives such as [the analogous statute] amply demonstrates that the [challenged law] is not crafted with sufficient precision to withstand First Amendment scrutiny." Id. at 329, 108 S.Ct. at 1168. Boos, then, is simply the flip side of cases such as National Right to Work Comm. and supports, rather than undermines, the judicial duty to give considerable deference to Congress's evaluation of the effectiveness of its prior laws. Here, because Congress has concluded that prior law was too narrow to effectuate the relevant government interests, National Right to Work Comm., the Hatch Act cases and their progeny are the applicable precedents, not Boos.
 
 
 84
 In the case before us, a comparison of the honorarium ban to prior ethics laws unmistakably reveals a congressional determination that only a broad, government-wide ban on honoraria is sufficient to protect against the appearances of impropriety or corruption accepting honoraria creates. Congress at first determined to allow people in all three branches of the federal government to accept honoraria, subject to amount limitations. See Pub.L. No. 93-443, § 101(f)(1), 88 Stat. 1268 (1974) (establishing $1,000 cap on honoraria for each covered activity and $15,000 annual cap, both exclusive of actual travel and subsistence expense reimbursement); Pub.L. No. 94-283, § 112(2), 90 Stat. 475, 494 (1976) (raising the individual and annual limits to $2,000 and $25,000, respectively). When Congress determined that these limitations were insufficient to curb actual or perceived abuses in Congress, each House adopted rules drastically restricting Members' ability to accept honoraria, although only the House of Representatives' rule actually went into effect. See Financial Ethics: Communication from the Chairman, House Committee on Administrative Review, H.R. Doc. No. 73, 95th Cong., 1st Sess. 9-12 (1977) (setting $750 limit for individual covered activities, as well as rules limiting acceptable outside income and expense reimbursement); Senate Code of Official Conduct: Report of the Senate Special Committee on Official Conduct, S.Rep. No. 49, 95th Cong., 1st Sess. 8-9, 37-40 (1977) (adopting similar restrictions as to Senate).
 
 
 85
 Some classes of congressional and judicial staff completely fell through the cracks of this patchwork of ethics regulations and were able to accept honoraria without limitation. See Quadrennial Commission Report, at 24. Even employees who were covered often were able to circumvent the limitations by, for example, receiving approval by their employing agencies of prohibited transactions. See GAO Report (concluding after survey of Executive Branch enforcement of ethics regulations that improper transactions frequently occur by virtue of lax enforcement).
 
 
 86
 Ultimately, Congress decided to dispense with its step-by-step approach to regulating honoraria, in favor of a uniform, government-wide ban. See 5 U.S.C. app. § 501 et seq. (1988 Supp. I). Congress made that decision based on two reports recommending that such action was critical to restoring or maintaining public confidence in the propriety of government employees' performance of their public functions. Congress's careful and deliberate approach to addressing the appearance of impropriety caused by employees accepting honoraria, as well as Congress's assessment of the ineffectiveness of prior ethics laws, are entitled to "considerable deference" from this Court. Federal Election Comm'n v. National Right to Work Comm., 459 U.S. 197, 209, 103 S.Ct. 552, 560, 74 L.Ed.2d 364 (1982). I, therefore, cannot accept the majority's conclusion that there were no "improprieties in the pre-s 501(b) era that would have been prevented by § 501(b) but not by the prior regulations." Maj. Op. at 1276.
 
 
 87
 [301 U.S.App.D.C. 22] 2. The Majority's Nexus Requirement
 
 
 88
 I also cannot accept the majority's proposition that "[t]o create the sort of impropriety or appearance of impropriety at which the statute is evidently aimed, there would have to be some sort of nexus between the employee's job and either the subject matter of the expression or the character of the payor." Maj. Op. at 1275. As amicus Common Cause puts it, "a defense contractor can just as easily and just as effectively gain improper influence by paying an honorarium to a Defense Department official to speak about hydrangeas as about hydraulics." Amicus Br. at 25. We recognized this in Sanjour, 984 F.2d 434, 450 (D.C.Cir.1993), stating that apart from any payor-payee or subject-matter nexus, "accepting valuable benefits from non-federal sources ... is the root cause of such an appearance," that is, an appearance of impropriety. All the public sees are employees, entrusted with carrying out the business of the government, receiving substantial payments from entities outside of the government--the public may not pause to consider whether there is a relationship between the payor and payee or the activity for which the honorarium is paid and the payee's job.
 
 
 89
 Appellees argue that Congress's determination that a complete ban on honoraria was necessary to avoid the feared appearances is of little moment here because the reports on which it relied employed a different definition of honoraria than the honorarium ban does. It is true that both reports define honoraria to "include 'payments for public appearances to deliver a talk or engage in a colloquy at the invitation of some non-government group.' " Wilkey Commission Report, at 35 (quoting Quadrennial Commission Report, at 24), whereas Congress defined "honorarium," in pertinent part, as "a payment of money or any thing of value for an appearance, speech or article ... by a Member [of Congress], officer or employee, excluding any actual and necessary travel expenses incurred by such individual." 5 U.S.C. app. § 505(3). That, however, is a distinction without a difference, for present purposes.
 
 
 90
 The issue here is whether a nexus is necessary for accepting honoraria to give rise to an appearance of impropriety or corruption, and on that issue, the definitions the statute and the reports utilize are in unison. Neither report defined honorarium to require the sort of nexus the majority describes. Indeed, the Wilkey Commission explained that "[t]o curtail the risk that individuals will find a way to circumvent these restrictions, the ban on honoraria necessarily needs to extend both to activities related to an individual's official duties and to other activities." Wilkey Commission Report, at 36 (emphasis added). In addition, the Quadrennial Commission reported to Congress that "honoraria should be defined so as to close present and potential loopholes such as receipt of consulting, professional or similar fees; payments for serving on boards; travel, sport, or other entertainment expenses not reasonably necessary for the appearance involved; or any other benefit that is the substantial equivalent of an honorarium." Quadrennial Commission Report, at 24 (emphasis added). Therefore, Congress's determination that appearances of impropriety can result from accepting honoraria for speeches or writings lacking a subject-matter or payor-payee nexus is reasonable.
 
 
 91
 3. Narrow Tailoring and the Pickering Balance
 
 
 92
 Based on the discussion above, I would hold that the honorarium ban is sufficiently narrowly tailored to survive facial challenge.[11] The Supreme Court has stated that " '[a] complete ban can be narrowly [301 U.S.App.D.C. 23] tailored but only if each activity within the proscription's scope is an appropriately targeted evil.' " Ward, 491 U.S. at 800, 109 S.Ct. at 2758 (quoting Frisby v. Schultz, 487 U.S. 474, 485, 108 S.Ct. 2495, 2502, 101 L.Ed.2d 420 (1988)). So it is here.
 
 
 93
 Here, it was appropriate to "target" employee acceptance of honoraria without a direct job nexus. First, as we have held, "accepting valuable benefits from non-federal sources ... is the root cause" of an appearance of impropriety or corruption. Sanjour v. EPA, 984 F.2d 434, 450 (D.C.Cir.1993). Second, based on the history of federal enforcement of honoraria regulations since Watergate, Congress could conclude that anything short of a complete ban on honoraria will allow employees to circumvent, advertently or otherwise, rules relating to honoraria. See GAO Report, at 9; Wilkey Commission Report, at 36; Quadrennial Commission Report, at 24. Although it might have been wise to allow the acceptance of honoraria in the absence of a nexus of the type the majority imposes, I cannot help but conclude that the honorarium ban is sufficiently tailored in the constitutional sense.
 
 
 94
 In fact, the conclusion that the honorarium ban is narrowly tailored follows from Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), and the Supreme Court cases upholding the Hatch Act, 5 U.S.C. § 7324 et seq. (1988), United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947).[12] In Buckley the Supreme Court upheld statutory limits on campaign contributions to candidates for federal elective office yet struck down independent campaign expenditure limitations. Both limitations were justified in part as prophylactic measures reasonably necessary to avoiding corruption or an appearance of corruption.
 
 
 95
 In upholding the contribution limitations, the Supreme Court emphasized that the feared appearance arose from the fact that the candidates who receive "large contributions" receive valuable benefits, "increasing[ly] importan[t] ... to effective campaigning," which may be given "to secure a political quid pro quo." 424 U.S. at 26, 96 S.Ct. at 638. Such an appearance did not arise from independent campaign expenditures--that is, expenditures by entities independent from a political campaign that were not coordinated with any campaign--because the candidate received no perceptible benefit from the expenditure. Id. at 47, 96 S.Ct. at 648 (stating that "[u]nlike [campaign] contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive"). It mattered not to the Court, in upholding the statutory campaign contribution limits, that preexisting statutes prohibited such corrupt exchanges and required disclosure of large campaign contributions: "Congress was surely entitled to conclude that ... contribution ceilings were a necessary legislative concomitant to deal with the reality or appearance of corruption inherent in a system permitting unlimited financial contributions." Id. at 28, 96 S.Ct. at 639.
 
 
 96
 There can be little question that the honorarium ban is more analogous to the contribution limitations upheld in Buckley than to the expenditure limitations invalidated therein. Honoraria, by definition, is a valuable benefit to the federal employee; it goes beyond expense reimbursement and constitutes income--a net financial gain. See National Treasury Employees Union v. United States, 927 F.2d 1253, 1255 (D.C.Cir.1991). Even a modest honorarium can often approach or exceed an employee's weekly salary, see, e.g., Affidavit of David E. Hubler p 4, at 2 (stating that he earned "$500 to $1,500 per article" as honoraria); Affidavit of Richard Deutsch p 10, [301 U.S.App.D.C. 24] at 3 (stating that he had been offered $3,000 to write a magazine article), and is sufficiently great to create financial dependency on the honoraria. See, e.g., Affidavit of John C. Shelton p 8, at 2 (stating that "based on my current financial situation, I will not be able to continue making payments on my mortgage if I have to give up the income from my writing"). Just as the receipt of a valuable benefit by one who may be financially dependent thereon was held to create an appearance of corruption in Buckley, see 424 U.S. at 26, 96 S.Ct. at 638, so the acceptance of honoraria--cash in excess of necessary costs--by federal employees creates an appearance of impropriety or corruption.
 
 
 97
 In the Hatch Act cases, on which the Court in Buckley relied in sustaining the campaign contribution limits, the Court upheld the Hatch Act's sweeping restrictions on the off-duty political activities of federal employees. See United States Civil Service Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). The Hatch Act forbids federal employees from "tak[ing] an active part in political management or in political campaigns," but allows employees to vote and to express their political opinions. 5 U.S.C. § 7324(a)(2) (1988). In United Public Workers, the Court held that the proscribed political activity was "reasonably deemed by Congress to interfere with the efficiency of the public service," which, the Court stressed, was all that was necessary to sustain its constitutionality. 330 U.S. at 101, 67 S.Ct. at 570.
 
 
 98
 The Court "unhesitatingly reaffirm[ed]" that conclusion almost three decades later, in Letter Carriers, 413 U.S. at 556, 93 S.Ct. at 2886. There the Court ruled that "it is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent." Id. at 565, 93 S.Ct. at 2890. The Court held that Congress's determination that even off-duty political activity by federal employees threatened public confidence in the impartiality of public employees was reasonable, in that it rested on "the judgment of history, a judgment made by this country over the last century that it is in the best interest of the country, indeed essential, that ... the political influence of federal employees on others and on the electoral process should be limited." Id. at 557, 93 S.Ct. at 2886. Neither the absence of legislative or record evidence substantiating the congressional determination nor the presence of preexisting laws addressing the evils that flow from a politicized federal workforce prevented the Court from counting the asserted government interest in the Pickering balance.[13] Id. 413 U.S. at 564-67, 93 S.Ct. at 2889-91.
 
 
 99
 Here, just as in the Hatch Act cases, Congress relied on the judgment of history in enacting the honorarium ban. That history reveals several facts that support the reasonableness of Congress's determination that honoraria must be banned from the federal government. First, honoraria undermine public confidence in government by creating an appearance of impropriety or corruption. Wilkey Commission Report, at 35, 36 (stating that "[h]onoraria paid to officials can be a camouflage for efforts by individuals or entities to gain the officials' favor" and that "the current ailment [caused by accepting honoraria] is a serious one"); Quadrennial Commission Report, at 24 (concluding that "[t]he potential for abuse or the appearance of abuse is obvious to the public" and that public confidence [301 U.S.App.D.C. 25] in the government "is threatened by the steady growth of this practice [honoraria]," particularly in Congress).
 
 
 100
 Second, only a uniform, government-wide ban will prevent determined federal employees from attempting to supplement their salaries by exploiting loopholes in ethics laws. See GAO Report, at 9 (concluding from survey of Executive Branch enforcement of prior ethics laws that federal ethics enforcement has been impeded by agencies' "overly permissive policies and practices"); see also Wilkey Commission Report, at 36 (explaining that "[t]o curtail the risk that individuals will find a way to circumvent these restrictions, the ban on honoraria necessarily needs to extend both to activities related to an individual's official duties and to other activities"); Quadrennial Commission Report, at 24 (concluding that "honoraria should be defined so as to close present and potential loopholes such as receipt of consulting, professional or similar fees; payments for serving on boards; travel, sport, or other entertainment expenses not reasonably necessary for the appearance involved; or any other benefit that is the substantial equivalent of an honorarium"). The conclusion that the honorarium ban is narrowly tailored under Ward, in sum, is all but dictated by the Supreme Court's decisions in United Public Workers and Letter Carriers, not to mention Buckley.
 
 
 101
 In view of my conclusion that the ban is narrowly tailored under Ward, it follows that the Pickering balance favors the honorarium ban. The ban imposes at most only a moderate burden on First Amendment rights because it allows appellees to engage in covered activities whenever and on whatever topics they choose and to accept reimbursement for all expenses they necessarily incur in doing so. At the same time, the ban fully effectuates the compelling government interest in avoiding the appearance of impropriety that allowing employees to accept honoraria causes, an interest Congress reasonably believed is harmed by tolerating honoraria. As a consequence, I would hold the honorarium ban constitutional under Pickering.
 
 III.
 
 102
 I also find unacceptable the majority's mode of severance. The majority limits its holding by "strik[ing] 'officer or employee' from § 501(b) except in so far as those terms encompass [M]embers of Congress, officers and employees of Congress, judicial officers and judicial employees," Maj. Op. at 1279, treating its redefinition of "officer or employee" as "a proper form of severance." Id. I do not believe this is consistent with controlling precedent on the subject of severance.
 
 
 103
 It is, of course, true that "if [a] federal statute is not subject to a narrowing construction and is impermissibly overbroad, ... only the unconstitutional portion is to be invalidated." New York v. Ferber, 458 U.S. 747, 769 n. 24, 102 S.Ct. 3348, 3361 n. 24, 73 L.Ed.2d 1113 (1982); see also Regan v. Time, Inc., 468 U.S. 641, 652, 104 S.Ct. 3262, 3268, 82 L.Ed.2d 487 (1984) (plurality opinion). However, it is settled that the duty to sever does not empower courts to "introduce words of limitation in order to uphold the valid applications" of a challenged statute. NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 44.16, at 529 (4th ed. 1986) (citing cases). "[T]he general federal rule is that courts do not rewrite statutes to create constitutionality." Eubanks v. Wilkinson, 937 F.2d 1118, 1122 (6th Cir.1991); see generally id. at 1124-25 (canvassing relevant caselaw of the Supreme Court).
 
 
 104
 Though severability may be achieved "by striking out or disregarding words that are in the [challenged] section," it may not be achieved "by inserting [words] that are not now there." United States v. Reese, 92 U.S. (2 Otto) 214, 221, 23 L.Ed. 563 (1875). Inserting into a statute words that Congress did not enact "would be to make a new law, not to enforce an old one," which "is no part of our [judicial] duty." Id.; see also Trade-Mark Cases, 100 U.S. (10 Otto) 82, 98, 25 L.Ed. 550 (1879) (holding that "it is not within the judicial province to give the words used by Congress a narrower meaning than they were manifestly intended to bear in order that crimes may be [301 U.S.App.D.C. 26] punished which are not described in language that brings them within the constitutional power of that body"). Although the Supreme Court cases discussed above involved penal Acts of Congress, their mandate, which is of continuing vitality, "has not been limited to penal statutes." Eubanks, 937 F.2d at 1125. Thus, for example, the Supreme Court, in American Tobacco Co. v. Patterson, 456 U.S. 63, 75, 102 S.Ct. 1534, 1540, 71 L.Ed.2d 748 (1982), noted that its decisions have "refused to narrow § 703(h)[, 42 U.S.C. § 2000e-2(h) (1988) ] by reading into it limitations not contained in the statutory language."
 
 
 105
 As one state court summarized the Supreme Court's severance precedents:
 
 
 106
 [W]henever a court, in order to uphold the provisions of a statute as constitutional, has to interpolate in such statute provisions not put there by the Legislature, in order, by such interpolation, to make the provision which the Legislature did put there constitutional, this is no case of severance, in any proper legal sense; nor is it in any legal or logical sense, a proper limitation of the provisions which are in a statute by judicial construction. Such an action by a court is nothing less than judicial legislation pure and simple.
 
 
 107
 Ballard v. Mississippi Cotton Oil Co., 81 Miss. 507, 574, 34 So. 533, 554 (1902) (citing United States Supreme Court cases). In the Supreme Court's words, "it is for Congress, not this Court, to rewrite ... [federal] statute[s]." Blount v. Rizzi, 400 U.S. 410, 419, 91 S.Ct. 423, 429, 27 L.Ed.2d 498 (1971).
 
 
 108
 Viewed in light of these principles, the majority's severance in this case is "nothing less than judicial legislation." Ballard, 81 Miss. at 574, 34 So. at 554. Expressly disclaiming any intent to strike "officer or employee" from the honorarium ban because "that would invalidate the ban beyond the executive branch," the majority writes into the statutory definition of that phrase a limitation to "[M]embers of Congress, officers and employees of Congress, judicial officers and judicial employees." Maj. Op. at 1279. This is precisely what the Supreme Court has said federal courts may not do. See generally Eubanks v. Wilkinson, 937 F.2d 1118, 1124-25 (6th Cir.1991) (discussing Supreme Court cases holding that federal courts may not rewrite federal statutes, under the guise of severance or otherwise).
 
 
 109
 The majority reads Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985), as support for the proposition that federal courts may, under the rubric of "severance," insert words of limitation into a statute. Brockett, the majority explains, " 'pretermit[ed]' the issue of whether [the statutory term] 'lust' might be construed as referring only to morbid and shameful interests ... and instead severed from the statute any meaning of lust other than shameful and morbid interests." Maj. Op. at 1279 (quoting Brockett, 472 U.S. at 500, 105 S.Ct. at 2800). Actually, the issue the Court pretermitted was whether or not it was required to defer to the lower court's conclusion that a saving construction of the term "lust" was impossible. 472 U.S. at 500, 105 S.Ct. at 2800. In any event, Brockett, properly understood, has no application here on the issue of severance (it is nonetheless instructive insofar as it declined to invalidate facially a statute held to be not narrowly tailored, on the ground the statute nonetheless had an easily identifiable core of constitutionally permissible application). See supra p. 1284 n. 6.
 
 
 110
 First, in Brockett it was far from clear that the legislature intended for "lust," the challenged statutory term, to have the reach the plaintiffs ascribed to it. See 472 U.S. at 500 n. 10, 105 S.Ct. at 2800 n. 10 (stating that "[a]ppellants make a strong argument that the Court of Appeals erred in construing the Washington statute"). Here, of course, the contrary is true--Congress unmistakably intended to prohibit appellees, and their counterparts in the other branches of the federal government, from accepting honoraria. See 5 U.S.C. app. § 505(2) (applying the honorarium ban to "any officer or employee of the Government" except as exempted by statute). Even appellees concede that point. See Appellees' Br. at 34 (disclaiming any suggestion [301 U.S.App.D.C. 27] that "[Executive Branch employees'] coverage was 'inadvertent' ").
 
 
 111
 Second, Brockett's holding was the product of the unusual and unique circumstances therein presented. Prevented from imposing a saving construction by the difficult issue of whether it was required to defer to the lower court's interpretation of the statute, the Court accomplished the same result via severance. Outside the unique circumstances of Brockett, no Supreme Court decision has employed the type of "severance" the majority employs here. Indeed, the Court on several occasions since Brockett has expressly refused to introduce words of limitation into statutes under the guise of "severance." See, e.g., Wyoming v. Oklahoma, --- U.S. ----, ----, 112 S.Ct. 789, 803, 117 L.Ed.2d 1 (1992) (refusing to perform "severance," excluding the unconstitutional applications from Oklahoma statute requiring all utilities seeking to provide electricity in Oklahoma to purchase at least 10% of its coal from Oklahoma sources, because "it is clearly not this Court's province to rewrite a state statute"); cf. Thornburgh v. American College of Obstetricians & Gynecologists, 476 U.S. 747, 764-65, 106 S.Ct. 2169, 2180-81, 90 L.Ed.2d 779 (1986) (refusing to sever from a statute restricting abortion a requirement that women seeking abortions be informed of the medical and psychological risks associated with abortion because "[t]he radical dissection necessary for [severance] would leave [the statute] with little resemblance to that intended by the Pennsylvania Legislature"), overruled in part on other grounds, Planned Parenthood of Southeastern Pennsylvania v. Casey, --- U.S. ----, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).
 
 
 112
 The majority's "severance" appears to me inconsistent with these post-Brockett cases. Even though the statute construed in Wyoming, as in Brockett, unlike the honorarium ban, contained a severability clause, the Court refused to introduce words of limitation in the statute to save its constitutionality, explaining:
 
 
 113
 [The statute] applies to "[a]ll entities providing electric power for sale to the consumer in Oklahoma" and commands them to purchase 10% Oklahoma-mined coal. Nothing remains to be saved once that provision is stricken. Accordingly, the Act must stand or fall on its own. We decline Oklahoma's suggestion that the term "all entities" be read to uphold the Act only as to the [Grand River Dam Authority, an agency of the state of Oklahoma], for it is clearly not this Court's province to rewrite a state statute. If "all entities" is to mean "the GRDA" or "state-owned utilities," the Oklahoma Legislature must be the one to decide.
 
 
 114
 --- U.S. at ----, 112 S.Ct. at 803-04 (emphasis added) (quoting Oklahoma statute). Although Wyoming dealt with a state statute, it cannot seriously be doubted that federal courts do not have license to rewrite federal statutes. See Blount v. Rizzi, 400 U.S. 410, 419, 91 S.Ct. 423, 429, 27 L.Ed.2d 498 (1971); Eubanks v. Wilkinson, 937 F.2d 1118, 1122 (6th Cir.1991).
 
 
 115
 As applied to this case, Wyoming teaches that a Brockett-type "severance" is entirely inappropriate. Like the protectionist statute invalidated in Wyoming, the honorarium ban is sweeping in its application, reaching "any officer or employee of the Government" (with a narrow statutory exception). 5 U.S.C. app. § 505(2). Also, here, as in Wyoming, the legislature unmistakably intended the breadth of their respective statutes; in this respect, each case differs from Brockett.
 
 
 116
 Finally, in this case, no less than in Wyoming, severance would leave in place "a fundamentally different piece of legislation" than originally enacted, Wyoming, --- U.S. at ----, 112 S.Ct. at 804, for Congress enacted a uniform, government-wide ban on honoraria. See Wilkey Commission Report, at 35-37 (referring, e.g., to "the extreme lack of uniformity across the three branches of government in the rules governing honoraria" and a need for "applying equitable limitations [on honoraria] across the government"). Leaving the ban operative as to officers or employees in the legislative and judicial branches, but not the Executive Branch, contravenes that congressional intent, and it is the intent of [301 U.S.App.D.C. 28] Congress that is controlling on the issue of severability. See Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 684-85, 107 S.Ct. 1476, 1479-80, 94 L.Ed.2d 661 (1987); Regan v. Time, Inc., 468 U.S. 641, 653, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984) (plurality opinion).
 
 
 117
 In short, since the majority has facially invalidated the honorarium ban, it should strike "officer or employee" in its entirety from the statute, leaving the honorarium ban in place only as to Members of Congress. Its failure to do so may reflect a reluctance to facially invalidate the honorarium ban. That reluctance, however, would be better served by striking the statute down as applied to appellees or, better yet, upholding the constitutionality of the statute.
 
 IV.
 
 118
 In conclusion, the Supreme Court's jurisprudence regarding facial challenges forecloses us from striking down the honorarium ban on its face. Under controlling caselaw, appellees should be required to demonstrate that applying the ban to them would violate the First Amendment. They have failed to make that showing, as the admittedly prophylactic ban is narrowly tailored to serve the government's compelling interest in avoiding the appearance of corruption or impropriety in its workforce. Moreover, because the honorarium ban imposes only a moderate burden on employees' First Amendment rights, the Pickering balance favors appellants in this case. I would therefore reverse the judgment below. Because the majority has chosen to take a different course, I respectfully dissent.
 
 
 
 [1]
 All but one of the individually named challengers fall into this class; the one exception is Peter G. Crane, a GS-16 executive branch employee
 
 
 [2]
 Before the summary judgment decision, the district court denied a preliminary injunction. We affirmed the denial. National Treasury Employees Union v. United States, 927 F.2d 1253 (D.C.Cir.1991)
 
 
 [3]
 Although the Court in Austin ultimately rejected the Chamber's claim that its conduct was protected, 494 U.S. at 661-65, 110 S.Ct. at 1398-1400, the sequence in which the Court addressed the matter is inconsistent with the idea that facial overinclusiveness claims can only be raised by parties whose conduct is not protected
 
 
 [4]
 The presence of some permissible applications of the statute that are "easily identifiable" does not immunize a statute from facial invalidation. Compare Dissent at 7-8. Secretary of State of Maryland v. Joseph H. Munson Co., 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984), says only that a statute may not be invalidated as overbroad when, "despite some possibly impermissible application, the remainder of the statute covers a whole range of easily identifiable and constitutionally proscribable conduct." Id. at 964-65, 104 S.Ct. at 2850-51 (citations and ellipses omitted). Similarly, United States Civil Service Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), holds only that when the threat to protected speech is limited, and the statute covers "a whole range of easily identifiable and constitutionally proscribable" conduct, the statute is not substantially overbroad. Id. at 580-81, 93 S.Ct. at 2897-98. Both these cases contrast very limited risks of invalid encroachments on speech with a broad range of permissible applications--not the situation we face in this case, in which the scope of the invalid applications is large
 
 
 [5]
 Because § 501(b) is unconstitutional for want of narrow tailoring, we do not reach the argument that it is unconstitutionally underinclusive
 
 
 [6]
 54 Fed.Reg. 15159, § 102, as amended by E.O. 12731 (October 7, 1990), 55 Fed.Reg. 42547, § 102
 
 
 [1]
 It is true that the Supreme Court has occasionally entertained facial challenges based on lack of tailoring without distinguishing between the two types of facial challenges. See, e.g., Simon & Schuster v. Members of the New York State Crime Victims Bd., --- U.S. ----, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (sustaining facial challenge to New York's "Son of Sam" law as not narrowly tailored); Austin v. Michigan State Chamber of Commerce, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990) (upholding as narrowly tailored, and therefore rejecting facial challenge to, Michigan's statutory limitation on corporate contributions to candidates for state office). In some of these cases it was unnecessary for the Court to make that distinction; for example, the Court's conclusion in Austin that the challenged statute was narrowly tailored rendered the precise nature of the plaintiffs' facial challenge academic
 Admittedly, in other tailoring cases where the precise nature of the facial challenge was unclear, the Court failed to reconcile its decisions with the New York State Club Ass'n framework. That fact, however, does not give us license to ignore that framework. See Gersman v. Group Health Ass'n, Inc., 975 F.2d 886, 895 (D.C.Cir.1992) (harmonizing conflicting lines of Supreme Court cases even though cases in each line sometimes ignored the other line), petition for cert. filed, 61 U.S.L.W. 3523 (U.S. Jan. 13, 1993) (No. 92-1190). Certainly, prior decisions of this Court have taken pains to distinguish between the two types of facial challenges. See, e.g., Sanjour v. EPA, 984 F.2d 434, 440 (D.C.Cir.1993); Federal Election Comm'n v. International Funding Inst., Inc., 969 F.2d 1110, 1118 (D.C.Cir.1992) (en banc), cert. denied, --- U.S. ----, 113 S.Ct. 605, 121 L.Ed.2d 540 (1992); American Library Ass'n v. Barr, 956 F.2d 1178, 1190 (D.C.Cir.1992).
 
 
 [2]
 The following exchange at oral argument between counsel for NTEU and one of my colleagues in the majority is relevant in this regard:
 THE COURT: What I find odd is--you are making an "overbreadth" challenge--
 COUNSEL: Sure, both overbreadth and as-applied.
 THE COURT: With respect to your overbreadth challenge, you want to make it, "it's overbroad as applied to us." ... You don't want to argue about anyone else, which is an odd, odd [kind of overbreadth challenge].... Is there any case that you know of, any Supreme Court or court of appeals case, where you have a restricted class making an overbreadth challenge only with respect to them?
 COUNSEL: I can't think of one off the top of my head.
 Tr. of Oral Arg. (Nov. 6, 1992). Counsel's inability to think of such a case is no accident, in view of the precedents discussed in the text.
 
 
 [3]
 The plaintiffs appearing individually and asserting their own rights are: (1) Peter G. Crane; (2) National Treasury Employees Union ("NTEU") Chapter 143; (3) David E. Hubler; (4) the American Federation of Government Employees, AFL-CIO ("AFGE"); (5) Richard Deutsch; (6) Charles Fager; (7) William H. Feyer; (8) Robert Gordon; (9) Judith L. Hanna; (10) George J. Jackson; (11) Eduard Mark; (12) Arnold A. Putnam; (13) Jan Adams Grant; and (14) Thomas C. Fishell. Each of the individually named plaintiffs filed suits in their own behalf and thus are obviously before us
 
 
 [4]
 "The obvious implication of Rule 23(c)(3) is that anyone properly listed in the judgment should be bound by it absent some special reason for not doing so." 7B CHARLES A. WRIGHT ET AL, supra, at 244; see also, e.g., Supreme Tribe of Ben-Hur v. Cauble, 255 U.S. 356, 367, 41 S.Ct. 338, 342, 65 L.Ed. 673 (1921) (stating that "[i]f the federal courts are to have the jurisdiction in class suits to which they are obviously entitled, the decree when rendered must bind all of the class properly represented")
 
 
 [5]
 See Secretary of State of Maryland v. Joseph H. Munson Co., 467 U.S. 947, 965, 104 S.Ct. 2839, 2851, 81 L.Ed.2d 786 (1984); New York v. Ferber, 458 U.S. 747, 770 n. 25, 102 S.Ct. 3348, 3361 n. 25, 73 L.Ed.2d 1113 (1982); United States Civil Serv. Comm'n v. Letter Carriers, 413 U.S. 548, 580-81, 93 S.Ct. 2880, 2897-98, 37 L.Ed.2d 796 (1973); Moore v. City of Kilgore, 877 F.2d 364, 391 (5th Cir.), cert. denied, 493 U.S. 1003, 110 S.Ct. 562, 107 L.Ed.2d 557 (1989)
 
 
 [6]
 The majority confuses the inquiry into the relative number of constitutional applications a challenged statute has, for the analytically distinct purposes of deciding whether a statute is narrowly tailored and, if not, whether it is facially invalid. See Maj. Op. at 1276 n. 4 (stating that "[t]he presence of some permissible applications of the [honorarium] statute that are 'easily identifiable' does not immunize a statute from facial invalidation" in cases where, as here, "the scope of the invalid applications is large"). As stated in the text, I agree that if a statute has a comparatively large number of unconstitutional applications, the statute is not narrowly tailored under Ward. However, under the majority's analysis, any statute that is not narrowly tailored is facially invalid. With this I cannot agree. Contrary to the majority's conclusion, a statute can be overbroad (i.e., not narrowly tailored) yet facially constitutional. See, e.g., Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 501-05, 105 S.Ct. 2794, 2800-02, 86 L.Ed.2d 394 (1985) (obscenity statute held not narrowly tailored yet facially constitutional); United States v. Grace, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (same as to statute banning demonstrations on the Supreme Court grounds); National Ass'n for the Advancement of Colored People v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (same as to statute banning solicitation by attorneys); Moore v. City of Kilgore, 877 F.2d 364, 390-93 (5th Cir.1989) (same as to restriction on municipal fire-fighters' speech)
 As the Supreme Court has held, when a statute is not narrowly tailored but nonetheless does have a "core of easily identifiable and constitutionally proscribable conduct," Secretary of State of Maryland v. Joseph H. Munson Co., 467 U.S. 947, 967 n. 13, 104 S.Ct. 2839, 2852 n. 13, 81 L.Ed.2d 786 (1984) (emphasis added), "the Court has required a litigant to demonstrate that the statute 'as applied' to him is unconstitutional." Id. at 976, 104 S.Ct. at 2857 (citing cases); see also Brockett, 472 U.S. at 504, 105 S.Ct. at 2802 (overbroad statutes are not to be facially invalidated under the first exception to the rule against facial challenges unless "the identified overbreadth is incurable and would taint all possible applications of the statute"). Indeed, this Circuit has recently held that Munson must be given full effect, not an unduly narrow and crabbed reading, such as the majority's. See Sanjour v. EPA, 984 F.2d 434, 444 (D.C.Cir.1993) (under Munson a plaintiff challenging a statute's tailoring in all possible applications "must carry the heavy burden of showing that the challenged statute or regulation is not narrowly tailored and that there is no core of easily identifiable and constitutionally proscribable conduct that the statute prohibits") (internal quotation marks omitted).
 
 
 [7]
 The degree of inconsistency between the majority's decision and Sanjour should not be misunderstood: As previously explained, Sanjour forecloses the majority from striking down the honorarium ban on its face, see supra pp. 1282-85, and as I explain in the text, Sanjour practically dictates the conclusion that the honorarium ban only moderately burdens appellees' First Amendment rights. Furthermore, as I explain in a later section of this dissent, Sanjour rejected the demand for objective evidence of harm to the government's compelling interest in avoiding the appearance or actuality of impropriety in the federal workforce and held that courts must defer to the government's determination that a proscribed practice will harm that government interest. See infra at pp. 1288-89. The law of this Circuit, whether in error or not, is binding absent correction by a higher court. See Save Our Cumberland Mountains, Inc. v. Hodel, 826 F.2d 43, 49 (D.C.Cir.1987) ("[w]hether or not [a prior case's] position on this point is correct ... this panel is bound by that position as the law of the circuit"), vacated in part on other grounds, 857 F.2d 1516 (D.C.Cir.1988)
 
 
 [8]
 Limiting the requirement for explicit legislative or record evidence to political expression or association, as In re Primus did, is not unreasonable because political speech in particular "occupies the highest rung on the hierarchy of First Amendment values." Connick v. Myers, 461 U.S. 138, 145, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983) (internal quotation marks omitted). Even in that context, though, one might question a requirement for findings because, in any event, "[d]eference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake." Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 843, 98 S.Ct. 1535, 1543, 56 L.Ed.2d 1 (1978)
 
 
 [9]
 This fact distinguishes this case from Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) ("NCPAC "). The statute struck down in NCPAC imposed a $1,000 limit on campaign expenditures by "political committees" for presidential and vice-presidential candidates receiving federal campaign funding. Given that campaign expenditures implicate political speech and association, id. at 493-94, 105 S.Ct. at 1466-67, it was altogether proper, under Bellotti and In re Primus, to require greater proof of harm to the relevant governmental interest and to reject a vague assertion of harm that was only "hypothetically possible." Id., 470 U.S. at 498, 105 S.Ct. at 1469. Again, here we do not face political speech or association, and the possibility of harm is quite specific and quite real. See infra at 1289-90
 
 
 [10]
 Indeed, requiring such proof of the government is inappropriate, given that the honorarium ban is a prophylactic rule. Inherent in the very nature of such a rule is the concept that the evil to be avoided has not yet occurred. It follows that it is inappropriate to require evidence of Executive Branch wrongdoing before Congress may enact a prophylactic rule against honoraria, and such a requirement is not a result commanded by the Constitution. See, e.g., Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam) (upholding prophylactic limitations on campaign contributions); United States Civil Service Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (upholding Hatch Act's prophylactic ban on political activities and speech of government employees), reaff'g United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). "Neither we nor the Supreme Court have held that in a Pickering case, the Government must prove that a regulation on speech overlaps with the threatened harm to the governmental interest at stake with mathematical precision." Sanjour v. EPA, 984 F.2d 434, 447 (D.C.Cir.1993)
 
 
 [11]
 I agree with the majority, however, that the more lenient tailoring requirement described in Ward v. Rock Against Racism, 491 U.S. 781, 800, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989), applies to content-neutral restrictions on speech, such as the honorarium ban. See Maj. Op. at 1274. I believe the Court should explicitly acknowledge that the Ward definition supersedes this Circuit's more stringent prior definition, which demanded that even content-neutral restrictions "be narrowly drawn to restrict speech no more than is necessary to protect a substantial governmental interest." McGehee v. Casey, 718 F.2d 1137, 1143 (D.C.Cir.1983) (brackets and internal quotation marks omitted)
 
 
 [12]
 The Supreme Court has read these cases to stand for the broad proposition that government employees may "act[ ] to protect substantial governmental interests by imposing reasonable restrictions on employee activities that in other contexts might be protected by the First Amendment." Snepp v. United States, 444 U.S. at 509 n. 3, 100 S.Ct. at 765 n. 3 (upholding restriction denying employees the right to profit from expressive activity that harms a substantial government interest)
 
 
 [13]
 The majority's attempted distinction of the Hatch Act cases--that there, because "[t]he potential for such subtle [political] pressure is not only pervasive but inherently difficult to demonstrate or assess ... the absence of episodes coming to light is quite consistent with the congressional concern" and no evidence was necessary, Maj. Op. at 1277--is unavailing. The congressional motivation for the Hatch Act was to achieve a federal workforce actually and perceived to be free of political influence. See Letter Carriers, 413 U.S. at 565, 93 S.Ct. at 2890 (referring to avoiding these congressional concerns as a "major thesis of the Hatch Act"). The predominant motivation for the Hatch Act mirrors Congress's present desire to avoid the actuality or appearance of impropriety that employees' accepting honoraria can cause